## CARDEN LIVESAY
### LTD
ATTORNEYS AT LAW

Joshua W. Carden, SBN 021698
419 East Juanita Avenue, Suite 103
Mesa, AZ 85204
joshua@cardenlivesay.com
(480) 345-9500
(480) 345-6559 (Fax)
*Attorney for Plaintiffs*

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| DiMarco Holdings, LLC, an Arizona limited liability company, Joseph DiMarco, and Thomas DiMarco, Jr., | |
| Plaintiffs, | **ORIGINAL COMPLAINT** |
| v. | |
| Vehicle Management Solutions, LLC, a Delaware limited liability company, Quik Pik, LLC, a Delaware limited liability company, Winfield Equity, LLC, a Washington limited liability company, Winfield QP, LLC, a Delaware limited liability company, Chris Brenes, an individual, and Scott Jensen, an individual, | |
| Defendants. | |

Plaintiffs seek relief in this Original Complaint against Defendants as follows:

### PARTIES

1.      Plaintiff DiMarco Holdings, LLC is an Arizona limited liability company, owned and managed by brothers Joseph DiMarco and Thomas DiMarco, Jr. at all relevant times herein.

2.      Plaintiff Joseph DiMarco is a resident of Maricopa County, Arizona.

3.      Plaintiff Thomas DiMarco, Jr. is a resident of Maricopa County, Arizona.

4.      Together the plaintiffs shall be referred as the DiMarco Plaintiffs, and the brothers



alone as the DiMarco brothers.

5. Defendant Vehicle Management Solutions, LLC ("VMS") is a Delaware limited liability company doing business in Maricopa County, Arizona, in that it has contracted with Plaintiffs for employment in Arizona.

6. Defendant Quik Pik, LLC ("Quik Pik") is a Delaware limited liability company registered to do and doing business in Arizona.

7. Defendant Winfield Equity, LLC ("Winfield") is a Washington limited liability company doing business in Maricopa County, Arizona, in that it has contracted with Plaintiffs in Arizona.

8. Defendant Winfield QP, LLC ("Winfield QP") is a Delaware limited liability company doing business in Arizona, in that it has contracted with Plaintiffs in Arizona.

9. Defendant Chris Brenes is an individual resident of Washington state, and a member of Winfield Equity, LLC with sufficient contacts with Plaintiffs and Arizona that he may reasonably be expected to be haled into Arizona court.

10. Defendant Scott Jensen is an individual resident of Washington state, and a member of Winfield Equity, LLC, with sufficient contacts with Plaintiffs and Arizona that he may reasonably be expected to be haled into Arizona court. Winfield, Winfield QP, Brenes, and Jensen shall be referred to herein as the Winfield Defendants.

11. Defendants Brenes and Jensen held themselves out as owners and board members of the towing company in Arizona. Defendant Winfield QP is believed owned by them or Winfield.

12. At all times relevant herein, the DiMarco brothers were employees of Defendants VMS and/or Quik Pik.

13. At all times pertinent to this Complaint, the Defendant entities' managerial employees were acting within the course and scope of their employment with Defendant; and as a result thereof, Defendant is responsible and liability is imputed for the acts and omissions of its managerial employees, as alleged herein, under the principles of respondeat superior, agency, and/or other applicable law.



## JURISDICTION AND VENUE

14.    The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1332 as there is complete diversity between the Plaintiffs and the Defendants and the claims involved represent damages to each Plaintiff far in excess of $75,000.00.

15.    Arizona is the state in which a substantial part of the events or omissions giving rise to the claim occurred, and/or where a substantial part of property that is the subject of the action is situated, and Defendants have either contracted for Arizona as the forum state or had such contacts with Arizona that they may be haled into court here.

16.    Accordingly, venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2).

## ALLEGATIONS COMMON TO ALL CLAIMS

17.    The DiMarco brothers and other members of their family previously owned a successful Arizona towing company called 5-D Leasing, LLC, which operated profitably providing towing services for, *inter alia*, federal, state, and local governments, and large insurance companies.

18.    In February 2019, the Winfield Defendants approached the DiMarco brothers and their family and issued a letter of intent to buy the towing company's assets.

19.    The DiMarco brothers were not yet ready to leave the company, and the Winfield Defendants expressly recognized the value of their ongoing participation in the company.

20.    However, the DiMarco family all agreed to the buyout, and so the assets of the company were sold.

21.    The sale was structured so that the DiMarco family members all got a payout (including the DiMarco brothers, whose shares of the proceeds were valued at $2 million each), and then Winfield Defendants formed a new entity – Defendant Quik Pik, LLC – where the Winfield Defendants became the owners of the new entity along with the DiMarco brothers.

22.    The "cost" to the DiMarco Plaintiffs to acquire their ownership in Defendant Quik Pik, LLC was $1.5 million from each brother and it was treated as a "credit" against the proceeds of the original sale – meaning that the net payout to the DiMarco brothers at the time of the sale was $500,000 each.



23.     Thus, upon information and belief, as of October 4, 2019, the ownership of Defendant Quik Pik, LLC was held 60% by Defendant Winfield QP, LLC and 40% by DiMarco Holdings, LLC (then owned equally by the DiMarco brothers).

24.     Thereafter, the Winfield Defendants began to work on a larger sale of the company, one that would eventually require Plaintiffs themselves to also sell their interests.

25.     In furtherance of this goal, the Winfield Defendants purchased another Arizona towing company called Shamrock – a competitor to Defendant Quik Pik, LLC.

26.     The Winfield Defendants did not offer the DiMarco Plaintiffs the opportunity to participate in this transaction.

27.     However, the Shamrock personnel and accounts associated with the company were eventually combined with Defendant Quik Pik, LLC, the entity that the DiMarco brothers were expected to continue running.

28.     Thereafter, the Winfield Defendants purchased United Road Towing, a much larger entity with 13 locations in 12 states.

29.     The Winfield Defendants did not offer the DiMarco Plaintiffs the opportunity to participate in this transaction.

30.     At all times, the Winfield Defendants used the time and towing company expertise of the DiMarco brothers to improve the value of the Winfield Defendants' separately owned companies, but without any corresponding compensation.

31.     Thereafter, in either 2021 or 2022, the Winfield Defendants began to negotiate the sale of the entire "bundle" of towing companies to Mill Point Capital.

32.     The DiMarco Plaintiffs were open to the sale, but still did not wish to depart the company immediately.

33.     The Winfield Defendants informed the DiMarco Plaintiffs that their payout proceeds from the sale would equal $1.5 million – the exact amount that they had invested.

34.     The DiMarco Plaintiffs protested that this did not represent the value of what they had done to improve the companies and the growth represented therefrom.

35.     The Winfield Defendants specifically promised the DiMarco Plaintiffs that, as part

of the sale, they would negotiate employment agreements that ensured that the DiMarco brothers would remain employees of the company, with set salaries and bonus structures for each of them that would total over $900,000 apiece above their ownership share of $1.5 million to represent what they had contributed.

36.    As the Winfield Defendants held themselves out to be sophisticated in the ways of equity and business negotiations, the DiMarco Plaintiffs relied upon this promise from the Winfield Defendants.

37.    The DiMarco Plaintiffs still believed that the Winfield Defendants were acting in their best interests as partners in their company.

38.    The Winfield Defendants presented the employment agreements to the DiMarco brothers, representing that all of the discussed terms were included, and made it clear that no sale could take place until the agreements were signed.

39.    The DiMarco Plaintiffs relied upon their business partners the Winfield Defendants, and, indeed, all the required provisions seemed to be present and in order.

40.    The DiMarco brothers each signed the employment agreements with Quik Pik, LLC, effective February 22, 2022.

41.    The terms of each DiMarco brother's agreement included, *inter alia*:

42.    A base salary of $140,000 for 2022, $150,000 for 2023, and $160,000 for 2024;

43.    A performance bonus of up to 50% of that base salary for each of those years to be paid 90 days after the end of the year;

44.    Two "stay bonuses" of $125,000 apiece if that Plaintiff remained employed as of December 31 in 2023 and again in 2024;

45.    Full benefits; and

46.    Certain restrictive covenants.

47.    During the negotiations, the Winfield Defendants and DiMarco Plaintiffs made clear to the ultimate buyers that it was the DiMarco Plaintiffs' joint expectation that, as part of the consideration of the sale, the DiMarco brothers would remain employees of the towing company as previously discussed.

48.    The DiMarco's Plaintiffs relied upon the assurances of VMS and the Winfield Defendants that their expectations were accurate.

49.    It was also made clear to all parties that the employment compensation promised to the DiMarco brothers was part of the overall consideration for the sale of Quik Pik, LLC.

50.    Upon the DiMarco brothers signing these employment agreements, the Winfield Defendants finalized the negotiations for the sale, and sold Defendant Quik Pik, LLC and the Winfield Defendants' other related companies to Mill Point Capital, a New York-based private equity firm.

51.    Upon information and belief, that sale took place sometime in 2022.

52.    The Winfield Defendants never provided the DiMarco Plaintiffs with term sheets or copies of the sale agreements with Mill Point Capital.

53.    The Winfield Defendants did not disclose to the DiMarco Plaintiffs information that would have been relevant to the negotiations for the sale.

54.    Upon information and belief, the Winfield Defendants structured the deal in such a way that paid themselves up front and did not require their further participation in the subsequent business.

55.    Upon information and belief, the Winfield Defendants structured the deal in such a way that they profited on their investment to a greater degree than the DiMarco Plaintiffs.

56.    Upon information and belief, the Winfield Defendants utilized the expertise of the DiMarco Plaintiffs to increase the attractiveness of their separately-owned companies to a buyer.

57.    Upon information and belief, the Winfield Defendants utilized the willingness of the DiMarco brothers to continue participating in the company to profit in the sale of their separately-owned companies to a greater degree than they could have otherwise.

58.    Upon information and belief, the Winfield Defendants strategically shifted the allocations of value to deprive the DiMarco brothers of their pro rata share of the overall sale.

59.    After the sale to Mill Point Capital, the DiMarco Plaintiffs did receive the $3 million, representing the DiMarco brothers' original $1.5 million credit/investment after the original sale in 2019.



60.     Thereafter, upon information and belief, the towing companies were all bundled under Defendant VMS (or its predecessor United Road Towing).

61.     Upon information and belief, Defendant VMS acquired all rights, duties, assets and liabilities of Quik Pik, LLC, which included the DiMarco brothers' employment agreements.

62.     After the sale, the DiMarco brothers became employees of Defendant VMS, which immediately began paying the DiMarco brothers their contractual salary under the existing agreements.

63.     No new agreement was offered by either side.

64.     Additionally, after the sale, Defendant VMS put Joseph DiMarco on its "executive team" and began required him to travel all around the country in 2022 and 2023 to its various locations (the former United Road Towing locations) in order to implement his same expertise there.

65.     Upon information and belief, Defendant VMS was aware of the expectations that the DiMarco brothers' employment agreements represented a significant portion of the DiMarco Plaintiffs' consideration for the sale.

66.     Upon information and belief, Quik Pik and VMS are managed together with such a unity of interests that they are joint employers of Plaintiffs.

67.     The DiMarco brothers performed work for Quik Pik and/or VMS in accordance with their employment agreements.

68.     On June 22, 2023, VMS suddenly terminated the DiMarco brothers without notice, ostensibly in order to "save money."

69.     Stunned, the DiMarco brothers examined their contracts only to learn that the Winfield Defendants had drafted them to include an "at will" provision allegedly allowing Quik Pick/VMS to terminate them at any time without payment of the promised compensation.

70.     The contracts also contained a 30-day notice period, which VMS ignored, which deprived the DiMarco brothers of additional pay to which they clearly would have been entitled.

71.     Neither VMS nor Quik Pik paid the performance bonus of $70,000 apiece to Plaintiffs for the company's performance in 2022 – an amount that would have become



contractually due and owing 90 days into 2023, well before the DiMarco brothers were terminated.

72.    Upon information and belief, Winfield Defendants drafted the employment agreements for Plaintiffs to give Quik Pik and VMS the ability to terminate Plaintiffs.

73.    Upon information and belief, Winfield Defendants conspired with Quik Pik and VMS to provide a way for VMS to terminate Plaintiffs without paying any of the required amounts.

74.    Upon information and belief, the Defendants created the employment agreements and sale documents and structured them in a way to avoid paying the DiMarco Plaintiffs the amounts that they otherwise would have received.

75.    As result of Defendants' actions, the DiMarco brothers have lost over $700,000 each in expected compensation resulting from the sale, and the DiMarco Plaintiffs lost potentially millions from the overall sale to Mill Point due to the Winfield Defendants failing to give them the opportunity to participate in a) the separately-acquired competitive businesses after using the DiMarco Plaintiffs to improve those businesses; or b) a proper pro rata portion of the entire sale.

76.    All conditions precedent to this lawsuit have been fulfilled or excused.

## COUNT ONE – UNPAID WAGES
### (DiMarco brothers against VMS/Quik Pik)

77.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

78.    VMS' and Quik Pik's contracts with the DiMarco brothers require the payment of "wages" – non-discretionary amounts for which Plaintiffs as employees had a reasonable expectation to be paid.  A.R.S. § 23-350.

79.    VMS and Quik Pik, their employer, failed to promptly pay wages due and owing the DiMarco brothers, their employees, in violation of A.R.S. §§ 23-353 and 23-355.

80.    Additionally, the context of the overall deal makes the entire sum contemplated under the employment agreements non-discretionary.

81.    These Defendants failed to act in good faith and lack reasonable justification for failing to pay the DiMarco brothers.

82.    Defendants' failure to pay has caused Plaintiffs damages, including treble damages under A.R.S. § 23-355.



## COUNT TWO - BREACH OF CONTRACT

### (All Plaintiffs/All Defendants)

83.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

84.    All Plaintiffs and all Defendants entered into various written agreements.

85.    Plaintiffs have acted in accordance with the terms of the contracts and have fully performed their contractual obligations, or have been prevented by Defendants from doing so.

86.    Defendants have breached the various written agreements without justification or excuse.

87.    Plaintiffs have, due directly to Defendants and each of their breaches, suffered direct and consequential damages in an amount to be determined at trial.

## COUNT THREE – BREACH OF IMPLIED COVENANT

### (All Plaintiffs/All Defendants)

88.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

89.    The nature of employment relationships in Arizona is contractual. A.R.S. § 23-1501.

90.    Furthermore, there are various written contracts among the parties.

91.    Each of the contracts at issue is subject to the implied covenant of good faith and fair dealing.

92.    All Defendants knew or should have known that the employment contracts constituted part of the consideration for the DiMarco Plaintiffs' sale of their share of the business.

93.    The Winfield Defendants knew or should have known that their agreements with the DiMarco Plaintiffs created the expectation that they would be fairly compensated for their company being included with others in the sale to Mill Point Capital.

94.    Defendants breached the implied covenant of good faith and fair dealing by the acts and omissions as alleged herein that have injured and continue to injure the right of Plaintiffs to receive the benefits of their contractual relationship.

95.    As a result of Defendants' breach of the implied covenant of good faith and fair dealing, Plaintiffs have suffered direct and consequential damages in an amount to be determined at trial.



## COUNT FOUR - BREACH OF FIDUCIARY DUTY

### (All Plaintiffs/Winfield Defendants)

96.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

97.    The Winfield Defendants are in such a unity of interest and control that they may each be held jointly and severally liable for the actions of any of them.

98.    The Winfield Defendants were in a fiduciary relationship with Plaintiffs as fellow LLC members and/or officers, including as majority interest holders in Quik Pik, LLC.

99.    This fiduciary relationship imposed a heightened duty of care on Defendants to act with the utmost care related to Plaintiffs and Plaintiffs' business interests.

100.    Defendants breached that duty of care by self-dealing, failing to disclose material facts, and by engaging in transactions that would be a conflict of interest with the towing company owned with the Plaintiffs.

101.    Winfield Defendants further breached that duty of care by preparing documents that they knew (or were reckless as to the result that they) would fail to ensure the Plaintiffs would receive the full consideration that they bargained for in the sale of the towing company.

102.    Upon information and belief, Winfield Defendants further breached that duty of care by denying Plaintiffs the opportunity to participate in the purchase and sale of the other towing companies, while using Plaintiffs' knowledge and expertise to enhance the value of the overall bundled sale to Mill Point Capital.

103.    Upon information and belief, Winfield Defendants further breached that duty of care by artificially suppressing the value of Quik Pik, LLC in connection with the overall sale to Mill Point Capital – depriving Plaintiffs of the full pro rata share of the sale to which they would have otherwise been entitled.

104.    The breach was a proximate cause of Plaintiffs' injuries, and Plaintiffs suffered actual damages as a result.

105.    Winfield Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiffs' rights.

106.    Winfield Defendants are therefore also liable to Plaintiffs for punitive damages.



## COUNT FIVE – FRAUD/FRAUDULENT INDUCMENT

### (All Plaintiffs/Winfield Defendants)

107. Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

108. The Winfield Defendants each of them made material representations to Plaintiffs, knowing that the representations were false (or at least ignorant of their truth), with the intent that Plaintiffs should rely on those representations and to induce Plaintiffs to enter contracts.

109. Winfield Defendants, acting themselves or through their agents and representatives, intended that those representations would be relied upon by Plaintiffs in the manner reasonably contemplated, and Plaintiffs were entitled to rely upon them.

110. Plaintiffs reasonably relied on those representations.

111. Plaintiffs' reasonable reliance was the proximate cause of their damages.

112. Winfield Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiffs' rights.

113. Winfield Defendants are therefore also liable to Plaintiffs for punitive damages.

## COUNT SIX – SECURITIES FRAUD

### (All Plaintiffs/Winfield Defendants)

114. Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

115. A.R.S. § 44-1991 forbids a person in connection with an offer to sell or buy securities, or a sale of securities, directly or indirectly to do the following: Employ any device, scheme or artifice to defraud; make any untrue statement of material fact, or omit to state any material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or engage in any transaction, practice or course of business which operates or would operate as a fraud or deceit.

116. As set forth herein, the Winfield Defendants engaged in one or more of these acts towards the Plaintiffs.

117. Plaintiffs relied upon Winfield Defendants' actions in their securities transactions.

118. The Winfield Defendants are therefore liable, jointly and severally, to Plaintiffs for all damages caused by their actions, including economic and punitive damages.

## COUNT SEVEN - NEGLIGENCE/NEGLIGENT MISREPRESENTATION
### (All Plaintiffs/Winfield Defendants)

119.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

120.    Winfield Defendants owed a duty of due care to Plaintiffs with regard to their disclosure of material terms of their various business opportunities, the sale to Mill Point Capital, and the preparation of the actual employment arrangements for the DiMarco brothers after the sale.

121.    Defendants knew, or could reasonably foresee, that Plaintiff would be damaged by their failure to disclose that Defendants had engaged in transactions with other entities, and failure to ensure the DiMarco brothers' continued employment after the sale so that they would receive the full consideration for the transactions.

122.    Plaintiffs were damaged as a result of Winfield Defendants' failure to exercise reasonable care in disclosure and preparing the employment documents.

123.    Winfield Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiffs' rights.

124.    The Winfield Defendants are therefore liable, jointly and severally, to Plaintiffs for all damages cause by their actions, including economic and punitive damages.

## COUNT EIGHT - CIVIL CONSPIRACY
### (All Plaintiffs/All Defendants)

125.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

126.    All Defendants were aware of the Plaintiffs' expectations regarding their consideration for the sale.

127.    Additionally, the Winfield Defendants engaged in multiple related transactions without disclosure of material facts to Plaintiffs that would have guided the Plaintiffs' decisions.

128.    Additionally, to induce the Plaintiffs to enter into the agreement to sell the towing company and remain on as employees, Defendants withheld information from Plaintiffs.

129.    Defendants engaged in a civil conspiracy to deprive the Plaintiffs of profits and other consideration, with knowledge that such deprivation would be unlawful.

130.    Defendants knowingly and intentionally assisted one another in depriving Plaintiffs of their expected profits and consideration.

131.    Plaintiffs were damaged as a result of Defendants' conspiracy to omit and obscure relevant information.

132.    Defendants' conduct was malicious, oppressive or in reckless disregard of Plaintiffs' rights.

133.    The Defendants are therefore liable, jointly and severally, to Plaintiffs for all damages cause by their actions, including economic and punitive damages.

## COUNT NINE – UNJUST ENRICHMENT
### (All Plaintiffs/All Defendants)

134.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

135.    All Defendants have been unjustly enriched by their actions towards Plaintiffs.

136.    Specifically, Defendants have been enriched by retaining monies that in justice and equity belong to Plaintiffs.

137.    Defendants' actions were the proximate cause of Plaintiffs' impoverishment.

138.    Defendants have no justification or excuse for their own enrichment and Plaintiffs' impoverishment.

139.    In the alternative to the claims above, Plaintiffs have no adequate legal remedy.

140.    Defendants should be ordered in equity to make restitution to Plaintiffs, including, *inter alia*, quantum meruit or return of consideration or specific performance.

## COUNT TEN – EQUITABLE ESTOPPEL
### (All Plaintiffs/All Defendants)

141.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

142.    Defendants intentionally or negligently induced Plaintiffs to believe certain material facts, namely that they would be paid in accordance with a specific compensation plan and that they would receive fair consideration in their transactions.

143.    Plaintiffs took actions in reliance on their reasonable belief of those facts, namely they sold their portion of the company, and did work for Defendants geared towards qualifying for



13

that compensation plan.

144.    Plaintiffs were injured by so relying, in that they have not received the compensation owed to them for their work under the compensation plan as represented to them by Defendants, or compensation for the various related transactions that Winfield Defendants conducted without an opportunity to participate.

145.    Defendants' wrongful conduct should be fully estopped as it threatens to work a serious injustice.

146.    The public interest will not be unduly damaged by the imposition of estoppel.

**COUNT ELEVEN – REFORMATION**

**(DiMarco brothers against VMS/Quik Pik)**

147.    Plaintiffs hereby incorporate all preceding paragraphs as if set forth herein.

148.    The DiMarco brothers bring two alternate theories of reformation of their employment agreements with Defendants VMS/Quik Pik.

149.    First that, by clear and convincing evidence, a mutual mistake was made by the parties in drafting the employment agreements and the minds of the parties had met on a definite intention before the instrument was drafted.

150.    Second, that, the agreements failed to conform to what both parties intended, the Plaintiffs were mistaken as to the factual content of the agreements, and the other parties, knowing of this mistake, kept silent, or the Plaintiffs were mistaken as to the factual content of the employment agreements because of fraudulent affirmative behavior of the other parties.

151.    Thus, the Court should order reformation of the parties' agreements to remove the improper "at will" employment clause and order Plaintiffs' reinstatement.

**STATUTORY DEMAND**

152.    Pursuant to A.R.S. § 29-3410, Plaintiff DiMarco Holdings, LLC hereby demands of Defendant Quik Pik, LLC all records listed in A.R.S. § 29-3410(A), as well as all documents related to the advertisement for sale, appraisals or valuations, and the sale of Quik Pik, LLC. All such records shall be delivered to the undersigned counsel. Pursuant to statute, DiMarco Holdings, LLC will pay the reasonable costs of copying the records, limited to the cost of labor and material.



**JURY DEMAND**

153.    Plaintiffs demand a trial by jury on all claims.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request the following relief:

A. Declaratory judgment under 28 U.S.C. § 2201 as to the rights and duties and legal status of the various parties in general and under the specific contracts identified;

B. An award of economic damages against Defendants, jointly and severally as appropriate;

C. An award for the unpaid wages due and owing due to Plaintiffs, including treble damages pursuant to statute from Defendants VMS/Quick Pik;

D. An award to Plaintiffs of additional compensatory and punitive damages, jointly and severally, caused by Defendants' actions;

E. Alternatively, an order of restitution including, *inter alia*, quantum meruit to Plaintiffs for Defendants' unjust enrichment;

F. Alternatively, that Defendants will be estopped from denying Plaintiffs the full compensation owed them for selling their company and remaining employed there;

G. Alternatively, an order reforming the Plaintiffs' contracts;

H. All reasonable attorneys' fees and costs incurred in prosecuting this action pursuant to A.R.S. §§ 12-341 & 12-341.01;

I. Pre- and post-judgment interest on all applicable amounts, at the highest legal or contractual rate; and

Respectfully submitted on this 31st day of August, 2023,

CARDEN LIVESAY, LTD.


By: s/Joshua W. Carden
Joshua W. Carden
*Attorney for Plaintiffs*

